IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2009

## GARY E. ALDRIDGE v. JAMES FORTNER, WARDEN, and STATE OF TENNESSEE

**Appeal from the Circuit Court for Hickman County**
**No. 08-5049C     James Martin, Judge**

**No. M2009-00477-CCA-R3-HC - Filed September 30, 2009**

The petitioner, Gary E. Aldridge, was convicted in 1997 of one count of aggravated kidnapping, two counts of aggravated rape, one count of rape, and two counts of simple assault, all perpetrated upon his estranged wife. The trial court imposed an effective sentence of sixty years, with a sentence of seventeen months and twenty-nine days to be served consecutively. The judgments were affirmed on direct appeal, and our supreme court denied permission to appeal. State v. Gary Eugene Aldridge, No. 01C01-9802-CC-00075, 1999 WL 632299, at *1 (Tenn. Crim. App. Aug. 19, 1999), perm. to appeal denied (Tenn. Jan. 31, 2000). Subsequently, the petitioner began a series of post-conviction filings. This appeal resulted from the dismissal of his fourth petition for writ of habeas corpus. The State argues that the notice of appeal was untimely and, therefore, the appeal should be dismissed. We agree and dismiss the appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and CAMILLE R. MCMULLEN, JJ., joined.

Gary E. Aldridge, Only, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; and Leslie E. Price, Assistant Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

In the direct appeal of the petitioner's convictions, this court observed that "the [petitioner's] presentation of the issues is clouded by his waffling argument." Id. at *5. The same description is true for our review of the petitioner's fourth try for habeas corpus relief, which, with attachments,

totals 244 pages. The facts, which resulted in the petitioner's convictions, were set out on direct appeal:

In May of 1996, Etta Mae Aldridge traveled from Monterrey, California to the [petitioner's] residence in Hickman County to visit and, apparently, to discuss their prospects for marriage. The [petitioner] and Etta Mae had known each other for approximately two years and had engaged in a long-distance relationship via the telephone. On June 23, 1996, the [petitioner] and Etta Mae Aldridge were married. Two weeks later, Etta's children joined her in Tennessee. By August that same year, the couple began experiencing marital problems. The couple separated and Etta went to Arkansas to live with relatives. On October 20, 1996, Etta returned to Tennessee to reconcile with the [petitioner].

On November 1, 1996, the [petitioner] and Etta traveled to their respective places of employment together, they shared lunch, and returned home together that evening. The [petitioner] was in a good mood and everything seemed "fine" at dinner. During their meal, the [petitioner] asked Etta if she had an affair while she was living in Arkansas. Etta denied any extramarital liaison. Her denial infuriated the [petitioner] who overturned the dinner table and backhanded Etta across the face. He called her a "bitch" and a "liar." The [petitioner] forced Etta into the couple's bedroom, where he disrobed. He then "doubled" his leather belt and began beating Etta upon her legs. While being beaten, he informed her that "he was gonna teach [her] to lie and to cheat." When the [petitioner] finally ceased his beating, he observed the bruises he had inflicted on his wife. He apologized to her, told her he loved her, and informed her that he would never hurt her again. The couple later engaged in sexual intercourse.

On November 15, 1996, Etta picked up her final paycheck from her former employer and completed some errands. She then picked up the [petitioner] from his place of employment later that afternoon. On the drive home, the [petitioner] started yelling at Etta about spending her paycheck. The topic then changed from money to "the guys from Arkansas that [Etta] supposedly had an affair with." Although she, again, denied the allegation, the [petitioner] "backhanded" her in the face. He then instructed her to drive onto a dirt road. Etta pleaded with the [petitioner] not to hurt her. He responded that "[they] were going to settle it once and for all." Etta stopped the vehicle and obeyed the [petitioner's] command to "get out" of the car. The [petitioner] then "started hitting [her] with his fist double handed." The hitting was followed with a beating with his belt. He threatened that "he felt like just killing [her] and throwing [her] into the river." Etta begged him to stop for the sake of the children. The [petitioner] then instructed Etta to get in the passenger side of the car. Still enraged, he then drove to another location. He stopped the car and again ordered her out of the car. "[H]e beat [her] some more," threw her on the hood of the car, and began to choke her. He exclaimed that "he wanted the truth and if [she]

-2-

wasn't going to tell the truth, he was going to beat it out of [her]." The [petitioner] wrapped his belt around her neck and started choking her. When he released his hold, Etta fell to the ground. He then placed his hand in his pocket and told Etta that "he felt like putting a bullet in [her] head." The [petitioner's] anger subsided and he told Etta to get back in the car. On the way home, however, he again backhanded her, giving her a "bloody nose." The victim suffered two black eyes, a bloody nose, and a swollen lip from this incident.

On Thanksgiving Day, Etta decided to leave the [petitioner]. That evening, she left their home and, accompanied by her children, went to a motel. The following day, she went to a women's shelter. The Hickman County Sheriff's Department was informed of the November 1 and November 15 assaults and charges were filed against the [petitioner]. Sometime during the month of December, Etta contacted an attorney to initiate divorce proceedings against the [petitioner]. On December 9, 1996, an order of protection issued from the Hickman County General Sessions Court enjoining the [petitioner] from abusing, threatening to abuse, or committing any acts of violence upon Etta. Despite this order of protection, Etta encountered the [petitioner] at the home of a mutual friend, Peggy Mitchell, during the early part of January. The [petitioner] told Etta that "he started wanting to be with [her] again" and that he was "sorry and that [they] could work things out." Consequently, Etta "went with him to his home where [they] made love that night."

On January 14, 1997, Etta Mae Aldridge filed a complaint of divorce in the Hickman County Chancery Court alleging irreconcilable differences and inappropriate marital conduct. The complaint alleged that the couple last resided in the same household on November 28, 1996.

Between 11:00 and 12:00 p.m. on January 18, the [petitioner] arrived at Etta's apartment wanting to talk with her. The [petitioner] attempted to persuade Etta to leave the apartment with him so they could talk in private. Etta resisted. The [petitioner] then quietly warned her that if she did not accompany him, "he would shoot [her] and then [her] kids." Etta retrieved her coat and told her twenty-one year old daughter Dawn to dial "911." It was later revealed that Dawn did not place the telephone call until the following morning.

On the way to the [petitioner's] house, he reminded Etta that he had previously warned her, "if he didn't get to take Cindy home with him on Wednesday," "[Etta's] life wouldn't be worth two cents." Etta pleaded for him not to harm her. He responded, "Oh, I'm not going to hurt you, I'm going to kill you." He added that "he would give [her] two choices, either a .357 or a .44." Shortly thereafter, they arrived at the [petitioner's] house and went inside. The [petitioner] then advised Etta that "[they] could do it [her] way or his way" and he began

questioning her about her affairs in Arkansas. When she denied having an affair, he hit her in the face.

> And then he grabbed [her] . . . by the arm, then we went into the bedroom and he shut the door, and I tried to grab a statute and it fell out of my hand, and then he grabbed me by this arm and he picked me up and he shoved me against the wall. Then he took his hand and he choked me and I started fighting him back, I started kicking and fighting him back, and then I fell to the floor and he started choking me some more and I started kicking him trying to get him off of me.

> And then he picked me up and he threw me across the bed and I hit a night stand and I cut my ear, and I knocked over the night stand and a lamp and broke it and he told me to sit it back up, so I did. And then he-----grabbed me again and he told me to take off my clothes, so I took them off and we went into the bathroom and the water pipes had broken, so he raised the back of the toilet and he dipped a towel and he washed my face . . . and I thought maybe he wasn't going to hurt me anymore.

> . . . And then we went back into the bedroom and he started hitting me again and he threw me on the bed and he started choking me, so I scratched him and he let go, and then he kept holding me down and I twisted his penis and he ripped my underwear at the same time.

> . . . .

> He forcibly had [vaginal] sex with me. I told him no, but he did anyway.

> . . . .

> He made me roll over and he put some liquid, it smelled like cherries, on me and he [put it] . . . on my anal area.

> . . . .

> And then he had forced sex with me there.

> . . . .

I asked him to quit and he wouldn't.  I kept trying to get away, but I couldn't.

. . . .

It hurt.  I can't describe how bad it hurt.

. . . .

He told me that all white trash, white whores liked it.

. . . .

I got dressed, he said he wanted to go to a friend's house . . . to Peggy Mitchell's house. . . .  We went there because Gary said he wanted to have a threesome and that she liked women.  So when we got there Gary sat in the recliner.  . . .

So Gary pulled me down in his lap and he raised my denim skirt . . .  I had on high knee boots . . . and he didn't let me put my underwear back on.

. . . .

And he pulled my skirt up and he showed Peggy--and he asked her how would she like to get a hold of that.

. . . .

[Peggy responded] 'It looks real good, Gary, but I don't think so tonight.  I don't feel well.'  So Gary put my skirt back down . . . . we left.

. . . .

[When we got back to his house] [w]e had sex again. . . .

. . . [H]e wanted to have oral sex.

. . . .

I didn't want to do anything with him.  I just wanted to go home.

. . . .

We had vaginal sex and then we went to sleep.

The next morning, the [petitioner] told Etta he loved her and that he was sorry. The couple then "just made love again." He asked her if she wanted to stay at the house with him. She declined his offer. Later, the [petitioner] warned Etta that if she told anyone about what happened he would beat her and then kill her. Early the next afternoon, before returning her home, the [petitioner] told Etta that he was "proud of her because she had put up a good fight."

Id. at **1-3 (footnotes omitted).

Subsequently, the petitioner began a series of *pro se* filings: (1) a 2000[1] petition for post-conviction relief, alleging ineffective assistance of counsel and denial of the petitioner's right to testify, which was dismissed by the post-conviction court and affirmed on appeal, Gary Eugene Aldridge v. State, No. M2001-02452-CCA-R3-PC, 2002 WL 31598841, at *1 (Tenn. Crim. App. Nov. 19, 2002); (2) a 2003 petition for writ of habeas corpus, alleging that the indictments were invalid, which the trial court dismissed, and the dismissal was affirmed on appeal, Gary E. Aldridge v. State, No. M2003-00703-CCA-R3-HC, 2004 WL 2346144, at *1 (Tenn. Crim. App. Oct. 19, 2004); (3) a 2005 petition for writ of habeas corpus, alleging that a jury had not determined all facts upon which his sentencing had been based, the imposition of consecutive sentences was cruel and unusual punishment, the fact he was married to the victim precluded his being prosecuted for rape, the trial court violated his right against self-incrimination, and an amendment to the indictment violated his right to a grand jury adjudication. The petition was dismissed by the trial court, the dismissal was affirmed on appeal, and permission to appeal was denied. Gary E. Aldridge v. State, No. M2005-01861-CCA-R3-HC, 2006 WL 1132073, at *1 (Tenn. Crim. App. Apr. 28, 2006), perm. to appeal denied (Tenn. Nov. 27, 2006); and (4) a 2007 petition for writ of habeas corpus, alleging that the indictment was defective and, as a result, he was being illegally detained. The trial court dismissed this petition, and the dismissal was affirmed on appeal. Gary Aldridge v. State, No. M2007-01268-CCA-R3-HC, 2007 WL 4232920, at *1 (Tenn. Crim. App. Dec. 3, 2007).

The present appeal resulted from the dismissal of the fourth petition for writ of habeas corpus filed by the petitioner, which was filed in 2008 and contended that the petitioner's sentences were void because he was not awarded jail credits as required; that the petitioner was sentenced in the wrong offender classification; that the court erred in ordering that certain of his sentences be served consecutively; and that the court did not have the authority to issue an amended judgment. The trial court dismissed this petition on August 13, 2008. The petitioner then filed a motion to alter or amend the judgment, which was denied on February 10, 2009, and this appeal was filed on February 18, 2009.

---

[1] It is unclear from the record as to the date this petition was filed, but the post-conviction court entered an order appointing counsel for the petitioner on August 31, 2000.

## ANALYSIS

Pursuant to Tennessee Rule of Appellate Procedure 3(b), a petitioner may appeal as of right from the final judgment of the habeas corpus proceeding. The notice of appeal shall be filed within thirty days after the date of entry of the judgment. Tenn. R. App. P. 4(a). Rule 4(a) further provides, however, that in all criminal cases the notice of appeal is not jurisdictional and may be waived "in the interest of justice."

In this matter, as we have set out, after the trial court dismissed his fourth petition for writ of habeas corpus, the petitioner did not file a notice of appeal but, instead, a motion to reconsider. As this court has explained, the filing of such does not toll the thirty-day period within which the notice of appeal must be filed:

> Pursuant to Tennessee Rules of Appellate Procedure 4(a), a notice of appeal "shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from[.]" There are certain motions that toll the time for filing the notice of appeal. Tenn. R. App. P. 4(c). However, a motion to reconsider is not among the specified motions that toll the thirty-day requirement. State v. Lock, 839 S.W.2d 436, 440 (Tenn. Crim. App. 1992) (citing State v. Bilbrey, 816 S.W.2d 71, 74 (Tenn. Crim. App. 1991)). Furthermore, this court has noted that our rules of criminal procedure do not provide for a motion to rehear or reconsider. State v. Ryan, 756 S.W.2d 284, 285 n. 2 (Tenn. Crim. App. 1988).

State v. Rockwell, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007).

Thus, the petitioner had thirty days to appeal from the trial court's dismissal of his petition on August 13, 2008. Apparently, he believed that he did not have to file a notice of appeal until after the trial court ruled on his motion to reconsider. As explained by Rockwell, however, this was not the case, and his notice of appeal was untimely by six months. We have reviewed the issues raised in the petition for writ of habeas corpus which, with attachments, totals 244 pages, as well as his reply to the State's motion to dismiss. We note that the petitioner did not address in any fashion the untimeliness of his notice of appeal, although raised by the State. We conclude that the interest of justice does not require our waiving the untimely filing of the notice of appeal to consider the petitioner's claims. See State v. Markettus L. Broyld, No. M2005-00299-CCA-R3-CO, 2005 WL 3543415, at *1 (Tenn. Crim. App. Dec. 27, 2005).

## CONCLUSION

Based upon the foregoing authorities and reasoning, we conclude that the interest of justice does not require our waiving the defendant's failure to file a timely appeal and, therefore, the appeal is dismissed.

_____
ALAN E. GLENN, JUDGE